**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

JENNIFER JEAN PARADA,

        Plaintiff,

vs.

GREAT PLAINS INTERNATIONAL
OF SIOUX CITY, INC., ROBERT
BYE, ARNOLD WARNTJES, and
LARRY HERBST,

        Defendants.

No. C 06-4002-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . 14
    *B. Individual Liability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    *C. Sexual Harassment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . . 21
            *a. The defendants' initial argument* . . . . . . . . . . . . . . 21
            *b. Parada's response* . . . . . . . . . . . . . . . . . . . . . . 22
            *c. The defendants' reply* . . . . . . . . . . . . . . . . . . . . 23
            *d. The parties' oral arguments* . . . . . . . . . . . . . . . . . 24
        *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            *a. Elements of the claim* . . . . . . . . . . . . . . . . . . . . 29
            *b. Harassment by Warntjes and Herbst* . . . . . . . . . . . 31
                *i. "Unwelcome" harassment* . . . . . . . . . . . . . . 32
                *ii. "Severe" harassment* . . . . . . . . . . . . . . . . . 36

D.  *Sexual Discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    1.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 40
          a.    *The defendants' initial argument* . . . . . . . . . . . . . 40
          b.    *Parada's response* . . . . . . . . . . . . . . . . . . . . . . 41
          c.    *The defendants' reply* . . . . . . . . . . . . . . . . . . . 42
    2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
          a.    *Prohibitions and analytical process* . . . . . . . . . . . 43
          b.    *Parada's **prima facie** case* . . . . . . . . . . . . . . . . 44
                i.    *The "qualification/meeting legitimate
                      expectations" element* . . . . . . . . . . . . . . . . . 45
                ii.   *The "similarly situated male/inference of
                      discrimination" element* . . . . . . . . . . . . . . 46
          c.    *The defendants' legitimate reasons* . . . . . . . . . . . 49
          d.    *Pretext and discriminatory animus* . . . . . . . . . . . 51
E.  *Retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    1.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 54
          a.    *The defendants' initial argument* . . . . . . . . . . . . . 54
          b.    *Parada's response* . . . . . . . . . . . . . . . . . . . . . . 55
          c.    *The defendants' reply* . . . . . . . . . . . . . . . . . . . 56
          d.    *Parada's oral argument* . . . . . . . . . . . . . . . . . . . 56
    2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          a.    *Parada's **prima facie** case* . . . . . . . . . . . . . . . . 57
                i.    *Protected activity* . . . . . . . . . . . . . . . . . . . 57
                ii.   *Causal connection* . . . . . . . . . . . . . . . . . . 58
          b.    *Legitimate reason and pretext* . . . . . . . . . . . . . . 60
F.  *Unequal Pay* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    1.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 61
          a.    *The defendants' initial argument* . . . . . . . . . . . . . 61
          b.    *Parada's response* . . . . . . . . . . . . . . . . . . . . . . 62
          c.    *The defendants' reply* . . . . . . . . . . . . . . . . . . . 63
    2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
          a.    *Prohibitions and applicable standards* . . . . . . . . . . 63
          b.    *Parada's **prima facie** case* . . . . . . . . . . . . . . . . 67

III.  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

A female "service writer" for a company that sells and services diesel trucks alleges that she was subjected to sexual harassment, sexual discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act, IOWA CODE CH. 216, and unequal pay in violation of the Equal Pay Act, 29 U.S.C. § 206(d). The defendants—the company, one of its owners, and two of its managers—have moved for summary judgment on all of the plaintiff's claims. Thus, the court must determine which, if any, of the plaintiff's claims should go to a jury.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' motion for summary judgment.[1]

---

[1]The court has been hampered in its efforts to verify the parties' statements of fact, because neither party complied with the local rule for summary judgment motions, which, *inter alia*, requires consecutive page numbering of appendices and identification of deposition excerpts. *See* N.D. IA. L.R. 56.1(e). The pages of the parties' appendices either are not consecutively numbered or are numbered in the wrong location, so that the page numbering is overlaid with and obscured by other information on the page, or both. In addition to improper page numbering, some citations to pages of the appendices in support of certain facts identify pages that apparently do not exist in the appendix cited or that do not contain the information for which the pages were cited. In some of these instances, the court was unable to find any other portion of the appendices that contained

(continued…)

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 3 of 69

The parties agree that plaintiff Jennifer Parada applied for an advertised position as a diesel technician with defendant Great Plains International Of Sioux City, Inc. (GPI), in March 2004, shortly after completing a diesel technician and service management course at a technical school in Wyoming. GPI is a diesel sales, service, and repair facility in Sioux City, Iowa. Defendant Robert Bye is the president of GPI and one of its shareholders.[2] Defendant Arnold Warntjes is the service manager for GPI and defendant Larry Herbst is the body shop manager. The defendants contend that, during the time that Parada worked at GPI, GPI employed in the service department a day lead person, a night lead person, a warranty clerk, and eight to twelve diesel technicians/mechanics. Parada

---

[1](…continued)

the stated information. Some deposition excerpts not only were not identified in the manner required by the local rule, but were not identified at all. In at least one instance, excerpts of one person's deposition were interpolated into excerpts of another person's deposition, presumably inadvertently, but certainly without proper identification of the deponent for the excerpts. Finally, the court notes that many of the parties' key factual allegations appear nowhere in any of their statements of fact and, instead, appear only in their briefs, sometimes with adequate citations to their appendices, and sometimes without adequate citations. *See* N.D. IA. L.R. 56.1(a)(3) & (b)(3).

The court understands that attorneys who practice in numerous jurisdictions, state, federal, or both, may be frustrated by the general proliferation of court rules. Nevertheless, this court's local rule for summary judgment motions has been developed and refined over several years, based on the experience of the court and attorneys, with the intention of making it easier for the parties to respond to each other's factual assertions and arguments, as well as to aid the court in the prompt and efficient disposition of summary judgment motions. Compliance with the rule, thus, helps everyone. Failure to comply with the applicable local rule for summary judgment motions in this case, in contrast, has made the parties' submissions confusing and the disposition of the motion unnecessarily laborious.

[2]The same or an overlapping group of shareholders, including Bye, also owns a South Dakota corporation with a similar name in Sioux Falls, South Dakota.

4

disputes that all of these positions were filled continuously during her tenure and disputes the number of diesel technicians employed by GPI. The defendants also assert that diesel technicians were paid between $8.50 and $17.50 per hour, depending upon experience, longevity, and duties. Parada does not dispute that contention.

Instead of hiring Parada for the advertised diesel technician position, however, GPI offered Parada a newly-created position as a "service writer," because the hiring manager noted that Parada had some service management training. GPI managers hoped that the new service writer would improve customer satisfaction, because the service writer would take over some of the duties formerly performed by GPI's "lead" mechanics and a warranty clerk, as well as other duties that the company's managers felt were not being performed adequately. The defendants describe the service writer position as "experimental," but Parada denies that characterization. She does, however, admit that she knew that GPI had not had a service writer before, so that she would be the first service writer at GPI. Parada accepted the service writer job. The parties agree that Parada was paid $11.50 per hour, which the defendants assert was well above what she would have received as a starting diesel technician. The defendants also point out that Parada had no experience as a diesel technician. Parada counters that she had experience through training. Parada started working for GPI as GPI's service writer in April 2004.

Although there are no written job descriptions for positions at GPI, the parties agree that Parada's duties as the service writer consisted of the following: greeting customers, writing up work orders; scheduling and assigning work to be done by the technicians; estimating completion time for the customer; obtaining information about the vehicles brought in for repair; keeping customers advised about the progress of their repairs; handling warranty parts; interacting with technicians; completing information on repair orders, including the customer's complaint, the cause identified by the diesel technician,

5

and the correction made; establishing the customer's method of payment; interacting with customers to be sure that they were satisfied with service and repairs; and performing some vehicle repairs. Parada asserts that, in addition, the duties of the service writer included doing some of the work formerly done by the day lead person, although she does not specify what work; keeping the diesel technicians advised of service bulletins; making sure that the diesel technicians did their "stories" on hard cards; picking up and returning customer trucks; and operating a forklift.

The defendants contend that the duties of the lead person included the following: performing work on repair orders; diagnosing the cause of reported malfunctions; examining trucks to see if additional safety or service work was needed; documenting the work performed; reviewing and understanding technical bulletins; test driving and shuttling vehicles; training and supervising all technician's work; assisting technicians when needed; assigning work to technicians; preparing estimates; administering housekeeping and safety procedures; using a forklift properly; reviewing "hard cards" turned in by technicians to assure that assigned work had been performed; handling customer complaints and service technician problems; advising the credit department of jobs that exceeded the initial estimate; being responsible for repairs needed to shop equipment and supplies; welding parts on trucks if needed; approving the diagnoses made by technicians and the parts required for repairs; and documenting the mechanics' work. Parada asserts, however, that the lead person did not have any "express" duties.

The day lead person quit shortly after Parada was hired. Parada contends that, from the time that the day lead person quit until she was terminated, she was not just the "service writer," but actually served as the "service writer/lead person" for the day shift. In September 2004, the night lead person also quit. Parada contends that, prior to the hiring of a new night lead person, and for a period of about a month beginning in

6

December 2004, when the new night lead person was off work recovering from a car accident, she served as the night lead person two nights a week in rotation with the service manager (Warntjes) and the body shop manager (Herbst). Although the defendants admit that Parada covered some of the day lead person's duties, they contend that she was unable to cover all of the duties formerly performed by the day lead person. The defendants also admit that Parada occasionally covered for the night lead person, before a new night lead person was hired and during the time the newly-hired night lead person was off work because of a car accident, but they dispute that Parada performed or could perform all of the same duties that were regularly performed by the night lead person.

The parties agree that William J.R. Riecks, the new night lead person hired in October 2004—with whom Parada compares herself for purposes of her unequal pay claim—had more than twenty years of experience as a diesel mechanic, but they disagree about the extent to which he had prior supervisory experience. The defendants contend that Parada has admitted that she did not know what Riecks's experience was or precisely what duties Riecks performed, and that she did not and could not perform all of the same duties he performed, even when she covered for him during his absence. In contrast, Parada contends that Riecks had no "express" duties as the night lead person, and that, in any event, she performed his duties in his absence.

Parada also contends that, because of restrictions from prior injuries, Riecks did not perform much actual repair work and, instead, was restricted to light work, such as changing light bulbs. Parada also contends that Riecks did not even have his own tools at GPI, so that he borrowed tools from a subordinate. As the defendants point out, the page of her appendix that Parada cites for this contention, page 48a, does not exist, nor is there any such statement on any of the four deposition pages that appear at page 48 of Parada's Appendix. Moreover, Riecks testified in his deposition that he *did* have his own tools at

GPI, *see* Defendants' Supplemental Appendix at 1; *see also* Plaintiff's Appendix at 43, and that he performed other tasks, besides changing light bulbs. *See* Plaintiff's Appendix at 45.

The parties agree that Riecks was paid $16.00 per hour, which the defendants contend included a $1.50 per hour "night shift differential." Parada contends that she was not paid a "night shift differential" when she covered Riecks's duties in his absence, but the defendants point out that neither was anyone else who substituted on the night shift. The parties agree that Riecks had a commercial drivers licence (CDL), but Parada did not. The defendants contend that the ability to test drive and shuttle vehicles was a desirable ability for diesel repair work, which is why a CDL was a desirable qualification for a lead person or diesel technician. Parada disputes any contention that a CDL was required to test drive or shuttle vehicles, and contends that she actually performed such work. She also contends that, if a CDL had been required for her position, she could have obtained one. Parada also disputes the defendants' contention that she was less able than Riecks to train or assist other diesel mechanics, despite the obvious disparity in their years of experience as diesel mechanics.

Shawn Holler was a diesel technician at GPI with whom Parada apparently had frequent conflicts. Holler was required to take work assignments from Parada, but Parada reported to Warntjes and Bye, on numerous occasions, that Holler would not do the work that she assigned him and made comments about her, her qualifications, and her competence.

More specifically, Parada alleges that, at one point during the week of December 13, 2004, Holler was swearing so badly about Parada that Bye overhead him and went into Warntjes office to talk with him about it. She also alleges that, on January 24, 2005, Holler would not do what Parada told him to do, told other employees not to listen to her,

8

called her a bitch behind her back, and flaunted her authority by doing unassigned and unauthorized work on a customer's truck, despite a warning from Warntjes, and that Parada eventually called Bye, who told Holler that Parada was in charge. Holler purportedly then told Parada, "We'll see who still has a job tomorrow," and with a hammer in his hand and looking in her direction said, "You know whose head I would like to bash in with this?" According to Parada, this incident was sufficiently severe that other employees at GPI recommended that she seek assistance in leaving at the end of the shift, and she had to call her spouse to take her home. Next, Parada alleges that, on February 9, 2005, Holler made a comment to another diesel technician in her presence that it "seems anymore that people that come out of school don't know anything," and later that same day, made a comment about a work order that Parada had written stating that the brakes on a vehicle were grabbing, suggesting that the order made no sense, because brakes are supposed to grab. Parada also alleges that, on February 11, 2005, Holler interrupted her while she was talking to a customer on the telephone, then complained to her supervisor when she turned her back on him to try to continue the telephone conversation, and later that same day, refused a work order that she gave him, prompting her to complain to Warntjes about Holler's attitude towards her. Parada alleges, next, that on February 14, 2005, Holler stated to a co-employee in her presence, "I wonder about the qualifications of a lot of people here." On February 17, 2005, Holler allegedly went, unassigned, to a customer lot. On February 18, 2005, Holler allegedly stated to a co-worker, "Notice the transmission person is not doing any of the transmission work," referring to Parada, who was known as the "transmission person," because she had attended "transmission school." On February 23, 2005, Holler allegedly told co-workers, in Parada's presence, that "she's not my boss." Also, during the last week of February 2005, Holler allegedly told Herbst, in Parada's presence, "Some people they hire here," "Arnie [Warntjes] was really scraping

9

the bottom of the bowl when he hired these people," and "it puts stress on the rest of us technicians that know how to do our jobs." Finally, Parada alleges that Holler kept parking in her parking place. Parada admits that Holler's comments and conduct were not sexual or impliedly sexual and that none of her complaints about Holler to management were about sexual harassment.

The parties agree that, on one occasion, Parada called Bye twice during one shift to complain that Holler was not following her directions, and that Bye then came to the shop, told Holler that he had to do the work assigned to him by Parada, and sent Holler home for the rest of the shift. Parada also admits that when she complained to Warntjes about Holler's refusal to do assigned work and other insubordinate behavior, Warntjes supported her and spoke to Holler. However, Parada also contends that Warntjes did not do anything that resulted in correcting Holler's behavior and, instead, that he exacerbated the problem by assigning her and Holler to the same shifts. Parada also contends that, on one occasion, Warntjes turned his back on her, supposedly in the same way that she had responded to Holler when he interrupted her on the telephone, and said something to the effect that she could see how rude treatment was given back to her. Parada also alleges that, on at least one occasion, Warntjes stood outside the service department door, pointed at her and then at Holler, and shook his head up and down, apparently suggesting that there was a relationship between them.

Parada also alleges that Warntjes, her direct supervisor, and Herbst, the body shop manager, made sexually offensive comments to her, usually in the service office while Parada was taking breaks. Parada contends that the conduct of Warntjes in question consisted of the following: telling her that a bald spot on the top of her head was caused by hitting her head on the bed post, presumably suggesting that she had been having sex at the time; asking her if she had rug burns on her face; asking her on two occasions if she

10

wanted anything from Victoria's Secret, and on one of those occasions, asking if she wanted "motion lotion"; asking if her husband was waiting for her wearing a bathrobe, cigar, and bubbles, and whether they did something, which he indicated by whistles or gestures, presumably indicating sexual activity; asking her if she had had wild, passionate, unrestrained monkey loving; asking her what happened to her chin and if she was going through puberty; asking her to talk about sex; asking her, on perhaps as many as fifty occasions, what she had done on the preceding weekend, purportedly indicating by whistles or gestures that he was asking about sexual activity; and asking her on a few occasions what she had for dinner the night before, again purportedly indicating by whistles or gestures that he was suggesting something sexual. Parada asserts that most of Herbst's allegedly harassing behavior consisted of laughing at Warntjes's comments. Parada also contends that, on a weekly basis, Warntjes and Herbst ogled her and stared at her buttocks when she was sweeping the floor or cleaning other areas and that they made sure that she was aware that they were doing so.

Parada admits that she did not stop taking breaks in the service office or start taking breaks in the break room in the basement, despite the allegedly offensive comments and conduct by Warntjes and Herbst. Parada also admits that she did not ever tell Warntjes or Herbst to stop making comments, or complain to Bye about any actions of Warntjes or Herbst, even though she saw Bye almost every day and knew that Bye had the power to discipline Warntjes and Herbst.

The defendants contend that, in October 2004, GPI managers began to receive complaints from customers specifically about Parada and that, eventually, at least five different customers, including GPI's most important customers, made complaints, often repeated complaints, about her. The gist of the complaints allegedly was that Parada did not communicate effectively with the customers, did not keep them informed as to the

11

status of their repairs, and did not schedule the work satisfactorily. According to Bye, one customer even refused to speak with Parada again, because of his frustration with her. Parada, however, contends that few, if any, complaints were brought to her attention and that Warntjes admitted that some of the complaints about her were about things that were not her fault. In any event, the defendants contend that, in late February, Warntjes and Bye decided that the position of service writer was not working out, because complaints indicated that customer satisfaction was actually deteriorating, rather than improving. Warntjes and Bye, therefore, decided to discontinue the service writer position and, instead, to offer Parada a diesel technician job, the job for which she had originally applied, at the same rate of pay that she was getting as a service writer.

On March 2, 2005, Parada contends that Warntjes told her that she was "fired" as the service writer, but could continue as a diesel technician at the same rate of pay. The parties agree that Parada turned down the offer to change to a diesel technician position, in whatever manner that offer was presented to her, and that she was, consequently, terminated. Parada denies that customer satisfaction was deteriorating and contends that she was terminated after she complained repeatedly about Holler's conduct.

### B. Procedural Background

On March 18, 2005, Parada filed an administrative complaint against GPI with the Iowa Civil Rights Commission, which was cross-filed with the Equal Employment Opportunity Commission, alleging sex and marital status discrimination based on conduct by Bye, Wartnjes, and Holler, sex and marital status harassment based on conduct of Holler, Warntjes, and Herbst, and unequal pay as compared to Riecks, the night lead person. Parada did not mark the box for "retaliation," however. *See* Defendants' Appendix, Exhibit 20. By letter from counsel dated September 29, 2005, Parada attempted

to amend her administrative complaint to include retaliation based on her exercise of her rights to complain to her supervisors about the creation of a sexually hostile environment and subsequent discharge for exercising such rights. Counsel requested that the amendment relate back to the date of the filing of Parada's original administrative complaint. *See* Defendants' Appendix, Exhibit 28. Parada contends that she exhausted the administrative process for all of her claims by receiving right-to-sue letters.

On January 6, 2006, Parada filed her Complaint in this action (docket no. 1), naming as defendants GPI, Bye, Warntjes, and Herbst. In her "First Cause of Action," Parada alleges "discriminatory actions of the Defendants" in violation of Title VII; in her "Second Cause of Action," she alleges "discriminatory actions of the Defendants" in violation of the Iowa Civil Rights Act (ICRA); in her "Third Cause of Action," she alleges "retaliatory actions of the Defendants" in violation of Title VII; in her "Fourth Cause of Action," she again alleges "retaliatory actions of the Defendants" in violation of Title VII, although she probably meant to allege such actions in violation of the ICRA, and the defendants appear to have understood that to be her claim; and in her "Fifth Cause of Action," Parada alleges unequal pay, but does not state whether such unequal pay violates federal or state law. As relief, Parada seeks declaratory judgment "that the acts and practices complained of herein are in violation of the Civil Rights Act of 1964, the Iowa Civil Rights Act, and the Equal Pay Act"; back pay, unpaid wages, and actual and compensatory damages; future wages and future compensatory damages; punitive damages; liquidated damages; costs, interest, and attorney fees; and such other relief as is appropriate. Parada also demanded a jury trial. The defendants filed a joint Answer (docket no. 5) on February 27, 2006, then filed an Amended Answer (docket no. 7) on March 20, 2006, then filed a Second Amended Answer (docket no. 14) on August 22,

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 13 of 69

2006. In its current form, the defendants' Answer denies Parada's claims and asserts various affirmative defenses. Trial in this matter is set to begin on Mary 14, 2007.

On January 11, 2007, however, the defendants filed their Motions [sic] For Summary Judgment (docket no. 19) now before the court, seeking summary judgment on all of Parada's claims. Parada filed her Resistance To Motion For Summary Judgment (docket no. 23) on February 23, 2007. The defendants then filed a Reply (docket no. 28) on March 9, 2007. On March 29, 2007, the court discovered that Parada had requested oral arguments on the defendants' Motion For Summary Judgment, although not in the manner required by applicable local rules, and set oral arguments on the defendants' motion for April 5, 2007. The oral arguments were subsequently rescheduled to April 6, 2007, owing to conflicts in the parties' schedules.

At the oral arguments, plaintiff Jennifer Jean Parada was represented by Blake Parker of the Blake Parker Law Office in Fort Dodge, Iowa. The defendants were represented by Margaret M. Prahl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., in Sioux City, Iowa. This matter is now fully submitted.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the

14

standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for

Case 5:06-cv-04002-MWB    Document 32    Filed 04/11/07    Page 15 of 69

trial." Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment discrimination cases." *See Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch.*

16

*Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "the ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). The court will apply these standards to the defendants' Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove such cases today than during the early evolution of federal and state anti-discrimination and anti-retaliation laws. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct

17

plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the Equal Pay Act, and state anti-discrimination and anti-retaliation laws—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

The court will consider, in turn, whether summary judgment is appropriate on each kind of claim that Parada asserts.[3] The court must first, however, settle questions concerning individual liability.

---

[3]Parada's Title VII and ICRA claims are determined according to essentially the same standards. *See Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA," employing "the analytical framework utilized by the federal courts in assessing federal law," although federal law is not controlling). Therefore, the court will not analyze separately the state and federal claims of sexual harassment, sexual discrimination, and retaliation, unless a difference between state and federal law becomes relevant to the disposition of the defendants' motion for summary judgment.

18

### B. Individual Liability

The individual defendants first seek summary judgment on Parada's Title VII claims for harassment, discrimination, and retaliation in her First and Third Causes of Action. They contend that the law in this Circuit is well-settled that individuals cannot be held liable under Title VII. Although Parada otherwise resists the defendants' Motions For Summary Judgment, she concedes that there is no individual liability under Title VII, so that claims under the First and Third Causes of Action should be dismissed as to the individual defendants.

As this court has recently observed,

> The Eighth Circuit Court of Appeals has repeatedly held that supervisory employees . . . cannot be held individually liable under Title VII. *See, e.g., Schoffstall v. Henderson,* 223 F.3d 818, 821 n. 2 (8th Cir. 2000); *Bales v. Wal-Mart Stores, Inc.,* 143 F.3d 1103, 1111 (8th Cir. 1998); *Bonomolo-Hagen v. Clay Central-Everly Community Sch. Dist.,* 121 F.3d 446, 447 (8th Cir. 1997); *Spencer v. Ripley County State Bank,* 123 F.3d 690, 691-92 (8th Cir. 1997). . . . Where supervisory employees cannot be individually liable on Title VII claims, there is no basis whatsoever to name them as defendants on such claims. Therefore, the individual defendants here . . . are entitled to dismissal of the Title VII claims against them in [the plaintiff's Complaint].

*Habben v. City of Fort Dodge*, ___ F.3d ___, ___, 2006 WL 294282, *9 (N.D. Iowa Jan. 29, 2007). Similarly, here, the individual defendants are entitled to dismissal of the Title VII claims against them, because they cannot be held individually liable on such claims. *Id.* Therefore, the individual defendants are entitled to summary judgment in their favor on the Title VII claims in the First and Third Causes of Action of Parada's Complaint.

In contrast, this court has noted, "It is clear that individual supervisory employees *may* be held liable for discriminatory employment actions under the ICRA, even though

19

Title VII does not authorize such a claim." *Habben*, ___ F.3d at ___, 2006 WL 294282 at *10 (emphasis in the original) (citing *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999)). Therefore, the court will continue to refer to the arguments of all defendants on Parada's sexual harassment, sexual discrimination, and retaliation claims, because those claims are also brought pursuant to the ICRA.

### C.  Sexual Harassment

In her First and Second Causes of Action, Parada alleges "discriminatory actions of the Defendants" in violation of Title VII and the ICRA, respectively. It appears from both Parada's administrative complaint and her Resistance to the defendants' Motions For Summary Judgment that she asserts that the "discriminatory actions" in question constituted both "sexual harassment" and "disparate treatment." It is equally clear from their motion for summary judgment that the defendants have understood Parada's "sexual discrimination" claims to include "sexual harassment" claims. Therefore, the court will consider the "sexual harassment" portion of Parada's First and Second Causes Of Action separately from the "disparate treatment" portion of those claims. Analysis of the "sexual harassment" portion of Parada's claims begins with the arguments of the parties. The arguments of the parties concerning the sexual harassment claims at the oral arguments differed considerably from—not just "clarified"—the arguments presented in their briefs. The court has taken the parties' oral arguments as the "final word" on what they are alleging or arguing in this case, where there is a difference between their oral arguments and their written arguments.

### 1.  Arguments of the parties

#### a.  The defendants' initial argument

In their initial brief in support of their motion for summary judgment, the defendants contended that the comments attributed to Warntjes and Herbst, if made, which they deny, were not objectively offensive or sufficiently severe or pervasive to be actionable. They pointed out that none of the conduct by Warntjes or Herbst (or for that matter, Holler) allegedly involved touching, an implication that any individual wanted to have sex with her, or a suggestion that Parada could improve her situation by having sex with them. They also argued that Parada has not alleged that she was called derogatory names or subjected to lewd and lascivious actions, gestures, or conversations. Indeed, they pointed out that Parada did not even tell Warntjes or Herbst to stop their conduct or complain about their conduct to Bye, nor did she stop taking breaks in the service office, all of which they contend undermines Parada's assertions of severity and unwelcomeness of the conduct in question.

In their brief, the defendants also contended (or at least, the court read their brief to contend) that Holler's behavior does not come within the ambit of recovery under Title VII or the ICRA, because Holler was Parada's subordinate and, as such, could not harass her as a matter of law, even if his conduct was sufficiently severe or offensive, which they deny.[4]  They contended, further, that Parada has admitted that Holler's comments and conduct were not sexual or impliedly sexual and that she never complained about Holler's

---

[4]For example, the defendants argued in their brief, *inter alia*, "It cannot be disputed that Holler was not in a position of authority, and any comments he made to her about her competence as a matter of law do not amount to sexual harassment. Further, he had no authority to discriminate against her, and his comments, unrelated to sex, are therefore not actionable under Title VII." Defendants' Brief In Support Of Motion For Summary Judgment (docket no. 19) at 13.

conduct as sexual harassment. Thus, they contended that Parada has admitted that Holler's conduct was not sexual harassment.

### b. Parada's response

Parada argued in her brief that the harassment by Warntjes and Herbst was harassment by supervisors that was "totally sexual." She also contended that the environment that their comments created was both objectively and subjectively hostile. She contended that the harassment was the more hostile and offensive, because it was done by supervisors and, in the totality of the circumstances, it demonstrated the harassers' bigotry, their power to make her embarrassed and uncomfortable, and their power and desire to make her know her place in the organization. Parada contended that the court must accept as true her contention that conduct by Warntjes and Herbst was also unwelcome and that she subjectively found it to be hostile.

As to harassment by Holler, whom Parada identifies as a co-worker, Parada argued in her brief that even conduct that is not overtly sex-based can, nevertheless, constitute sexual harassment, if the conduct was done because the victim was female, and that is the situation here as to Holler's conduct. She contended that, at the very least, the record generates a genuine issue of material fact as to whether Holler's disrespectful conduct was directed at her because she was the lone female in the service area and because of his resentment towards a female in a supervisory role. She also contended that Holler used a sex-based epithet, bitch, toward her, and even used physically threatening behavior and verbal threats of physical violence. She also contended that Holler's conduct created or contributed to an oppressive work environment. Moreover, she contended that such conduct was unwelcome, because she complained about it constantly to her supervisors. Finally, she contended that GPI and her supervisors certainly knew of Holler's conduct,

because she complained about it frequently, but they did nothing effective to end or prevent such conduct.

### c.     The defendants' reply

In their Reply in further support of this part of their motion for summary judgment, the defendants argued that Parada has admitted that nothing Holler did or said was sexual harassment and that, during her deposition, her attorney stated that the Complaint was in error when it alleged that Holler's conduct was "sex harassment" because it should have said "sex discrimination." Therefore, the defendants requested summary judgment in their favor on any claim of sexual harassment relating to Holler, based on Parada's admissions and those of her counsel. The defendants also reiterated (or at least the court understood them to reiterate) that the claim fails as to Holler, because his conduct was not based on sex and because he was Parada's subordinate.[5] They also argued that Holler's conduct clearly arose from his resistance to following the directives of a person whom he considered less qualified than he was, so that no reasonable jury could conclude that

_____

[5]The defendants argued, "The claim that Holler's conduct was sexual harassment should be dismissed for the additional reason that conduct was not based on sex and that the alleged harasser was the plaintiff's subordinate." Defendants' Reply (docket no. 28) at 2. The defendants also argued,

> [I]t is undisputed that Holler was Plaintiff's subordinate, not a co-worker or a supervisor. The logic this court has followed in determining that the status of the alleged harasser is relevant to whether the harassment was sufficiently severe to affect a term or condition of employment should be applied to determine that alleged harassment by a subordinate is not actionable. Using that logic, one concludes that a plaintiff who complains of harassment by a subordinate can have no fear of personal, social or professional consequences.

*Id.* at 3-4 (citations omitted).

Holler's conduct was based on sex. They contended that Parada has only secondhand knowledge of Holler calling her a bitch, because she did not hear him call her that, and only secondhand knowledge that Holler had accused another employee of having a relationship with Parada, which she considered harassment, because she only learned of that accusation from the other employee, not from Holler. The defendants apparently suggested that conduct of which Parada had only secondhand knowledge could not be harassing. The defendants also contended that the record here is devoid of evidence that Holler made any comments or engaged in any conduct about which Parada complains because she was a woman and there are no comments suggesting that Holler thought Parada's job was not a "woman's job" or that women had no place in the workplace. They contended that the "tone of bigotry," on which Parada relies, is not supported by any evidence in the record. Finally, the defendants reiterated that Holler was Parada's subordinate, not a co-worker or supervisor, so that the logic of this court's reasoning, in a decision in a prior case, that the status of the harasser matters to the severity of the harassment suggests that Holler's conduct was not sufficiently severe to be actionable.

The defendants did not reply to Parada's arguments concerning sufficiency of the evidence of harassment by Warntjes and Herbst to generate jury questions.

### d. *The parties' oral arguments*

As mentioned above, the parties' oral arguments concerning whether or not Holler sexually harassed Parada were either quite different from their written arguments or, at least, were quite different from what the court had understood the parties to be arguing in their briefs. Therefore, the court will also summarize the parties' oral arguments on the sexual harassment claim.

In the course of oral arguments, the court took defendants' counsel to task on what the court had taken to be the defendants' assertion that only someone in higher authority

24

has the power to sexually harass someone.  In response, defendants' counsel asserted that she was trying to make a distinction between sexual harassment by a subordinate and sexual discrimination by a subordinate, and to argue that *the latter* is not possible, because a subordinate has no power to affect a term of the alleged victim's employment.  Similarly, when the court stated that it had understood the defendants to argue in their briefs that, as a matter of law, Holler could not have engaged in sexual harassment of a supervisor because he was a subordinate, defendants' counsel expressly stated that she "didn't mean to say that."  Instead, defendant's counsel explained as follows:

> [DEFENDANTS' COUNSEL:]  I intended to make the distinction between sex discrimination and sex harassment, and I understand that sexual harassment is a form of discrimination.  But yes, I do not intend to argue that a coworker or a subordinate can't harass someone.  But without power to affect her employment, he cannot discriminate against her.  He cannot—
> THE COURT:   Because he doesn't have any power over a term and condition of employment.
> [DEFENDANTS' COUNSEL]:   Yes.

Realtime Transcript of Oral Arguments on April 6, 2007.

Parada's counsel also attempted to clarify precisely what Parada is alleging with regard to the conduct of Shawn Holler.  Counsel stated the following:

> [PLAINTIFF'S COUNSEL:]  Let me try and explain the Shawn Holler situation.  The pleadings did say sex harassment.  That was a mistake that I made.  It should have been just sex discrimination.  The complaint with Shawn Holler—
> THE COURT:   And you corrected that at the deposition, didn't you?
> [PLAINTIFF'S COUNSEL]:   Yes.
> THE COURT:   Why didn't you go ahead and then amend your pleadings to correct that?

[PLAINTIFF'S COUNSEL]:   Good question, Judge. It should be reflected in the pleadings that it's sex discrimination.  It should be there in the pleadings.

The claim with Shawn Holler, though, is a retaliation claim.  It's not a sex discrimination complaint about Shawn Holler.  It's what happened with respect to Shawn Holler. When Ms. Parada began to make her complaints about what Shawn Holler was doing to her—and she believes and perceives that that was all based on the fact that he was a man, she was a woman, and he refused to work for her—she began to make those complaints to her supervisors, and the result is she was discharged for it.  So that aspect of the case is a retaliation complaint. . . .

Realtime Transcript of Oral Arguments on April 6, 2007.  In light of Parada's counsel's representations at oral arguments, the court must conclude that Parada is not now alleging that conduct of Shawn Holler was, itself, either actionable sexual harassment or actionable sexual discrimination, but was, instead, only the basis for Parada's retaliation claim.

More specifically still, Parada's sexual harassment claim, as it now stands, is based *only* on the conduct of Warntjes and Herbst, her supervisors, and the court will not reach the interesting question of whether an employee can be sexually harassed by someone who is nominally that employee's subordinate.[6]

---

[6]The court would not find persuasive an argument that a nominal "subordinate" cannot, as a matter of law, sexually harass a nominal "superior."  First, the court has found no decision of the Eighth Circuit Court of Appeals or any other court, and when they appeared to assert such an argument the defendants have cited none, holding that, as a matter of law, a nominal "supervisor" cannot be harassed by a nominal "subordinate." Indeed, the only decision squarely confronting that question that the court has found rejected such a contention.  More than two decades ago, in *Moffett v. Gene B. Glick Co., Inc.*, 621 F. Supp. 244 (N.D. Ind. 1985), *overruled on other grounds*, *Reeder-Baker v. Lincoln Nat'l Corp.*, 644 F. Supp. 983 (N.D. Ind. 1986), the United States District Court
(continued…)

26

‎6‎(...continued)

for the Northern District of Indiana rejected an employer's argument that it could not be liable for any harassment of the plaintiff employee, because the alleged harassers were the plaintiff's "subordinates." *Moffett*, 621 F. Supp. at 271. The court rejected the employer's argument, in part, because the plaintiff, a rental manager at an apartment complex, could not discipline the alleged harassers, members of the maintenance staff, because the maintenance staff was "independent" of the rental manager "by virtue of the assignment of hiring, firing, training and supervision authority to persons other than the Rental Manager." *Id.* The court found that, notwithstanding that the rental manager was "responsible" for the complex, there was not sufficient evidence of a supervisor-subordinate relationship between a rental manager, like the plaintiff, and maintenance staff members, like the alleged harassers. *Id.* Despite the plaintiff's ostensibly higher position in the managerial hierarchy, the court found that the relationship between the plaintiff and the alleged harassers was "closer to a co-worker relationship," with a common supervisor. *Id.* at 271-72. In addition or in the alternative, the court in *Moffett* found that the dispute about the nature of the plaintiff's managerial relationship to the harassers was "something of a red herring," because the court was "convinced that the relationship between the parties is immaterial to the question of whether plaintiff could be harassed in violation of Title VII." *Id.* at 272. The court reasoned that the relationship between the plaintiff and the alleged harassers, *i.e.*, whether the harassers were co-workers or supervisors, might affect the nature of proof required to establish liability, but did not change the potential for liability. *Id.* The court also noted that the Sixth Circuit Court of Appeals had affirmed the liability portion of a jury verdict in favor of a supervisor harassed by subordinates, and pointed out that the issue of the plaintiff's status as a supervisor of those harassing him "was not even raised precisely because it is a non-issue—a court looks at an employer's knowledge of and response to harassment regardless of the relationship between the parties." *Id.* (citing *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir. 1985)). The court concluded that, "provided the elements of respondeat superior are present," the employer could be liable for harassment by nominal subordinates of a supervisor. *Id.*

    This court agrees with the conclusion of the court in *Moffett* that the status of the alleged harasser in the company hierarchy may determine the nature of the proof required to establish employer liability, but does *not* determine, by itself, the potential for liability of the employer. In the intervening decades since the decision in *Moffett*, the Supreme

(continued...)

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 27 of 69

(...continued)

Court has clarified the standards for determining when an employer is liable for harassment by a co-worker or a supervisor. *See See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. Boca Raton*, 524 U.S. 775 (1998). Nowhere in those decisions, however, did the Supreme Court suggest that the *potential* for liability depended upon anything other than the first four elements of a sexual harassment claim, which focus on the nature and impact of the harassment, not on the status of the harasser. Thus, this court cannot conclude that an alleged harasser's status as a "subordinate" of a plaintiff necessarily or as a matter of law means that the "subordinate" cannot engage in actionable harassment. A "subordinate," however, presumably lacks the capacity to engage in *quid pro quo* harassment of a "supervisor," because the subordinate ordinarily lacks the capacity to grant or withhold a benefit of employment based on the supervisor's acquiescence in or repulsion of sexual advances.

Second, as *Moffett* suggests, an argument that a "subordinate" cannot, as a matter of law, harass a "supervisor" ignores the nature of the actual relationship between the alleged harasser and the alleged victim in the company's hierarchy, and in particular, the authority that the alleged victim actually had over the alleged harasser. *See Moffett*, 621 F. Supp. at 271-72 (finding that the harassers were not the plaintiff's "subordinates," and were, instead, "co-workers" for purposes of a harassment claim, because the maintenance staff (the harassers) was "independent" of the rental manager (the plaintiff) "by virtue of the assignment of hiring, firing, training and supervision authority to persons other than the Rental Manager"). This court has taken the position that, for an alleged harasser to be a "supervisor" for purposes of determining the proper test for employer liability, the harasser must have the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties. *See Joens v. John Morrell & Co.*, 243 F. Supp. 2d 920, 934-41 (N.D. Iowa 2003) (citing, *inter alia*, *Mikels v. City of Durham, NC*, 183 F.3d 323, 333-34 (4th Cir. 1999), and *Hall v. Bodine Electric Company,* 276 F.3d 345, 355-56 (7th Cir. 2002)). The Eighth Circuit Court of Appeals accepted this standard and affirmed this court's conclusion that the alleged harasser in *Joens* was not the plaintiff's supervisor, where the harasser lacked such authority over the plaintiff. *See Joens v. John Morrell & Co.*, 354 F.3d 938, 940-41 (8th Cir. 2004) (noting, but rejecting, a broader test, which found that an alleged harasser was a supervisor if the harasser possessed the authority to direct the employee's daily work activities, even if the harasser lacked the power to take

(continued...)

28

## 2. Analysis

### a. Elements of the claim

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). As the Eighth Circuit Court of Appeals has

---

[6](...continued)

tangible employment action against the victim, citing, *inter alia, Mack v. Otis Elevator Co.,* 326 F.3d 116, 127 (2d Cir.), *cert. denied,* 540 U.S. 1016 (2003)). This court can think of no reason why the same standard should not apply to the question of whether a *plaintiff* is the alleged *harasser's* "supervisor" for purposes of a Title VII sexual harassment claim.

Third, an argument that a "subordinate" cannot harass a "supervisor" as a matter of law ignores the effect of any evidence that those with supervisory authority over both the plaintiff and the alleged harasser acquiesced in, condoned, permitted, ratified, or joined in the harassment of the plaintiff. *See, e.g., Steck v. Francis*, 365 F. Supp. 2d 951, 972 (N.D. Iowa 2005) (harassment by a common supervisor appears to carry the weight and imprimatur of the employer's authority and seems to authorize or condone like conduct by subordinates, thereby fostering a perception that the environment as a whole is hostile and actually enhancing the hostile nature of the environment); *cf. Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 356 & n.5 (8th Cir. 1997) (a plaintiff's failure to complain to supervisors about a hostile work environment was excused where the supervisors created and condoned the objectionable atmosphere). Where "subordinates" are allowed to "get away with" harassment of a nominal "supervisor," the relative status of the alleged harasser and the victim ceases to have any real meaning to the determination of whether or not the harassment constituted a hostile work environment.

Finally, whether a hostile environment has been created must be determined in light of the totality of the circumstances. *Nitsche*, 446 F.3d at 845-46; *Baker*, 382 F.3d at 828. Relying solely on the alleged harasser's status as a "subordinate" of the plaintiff to hold that the harasser cannot, as a matter of law, harass the plaintiff, improperly focuses on only a single factor in that totality.

29

explained, "[D]iscrimination based on sex that creates a hostile or abusive work environment violates Title VII." *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 845 (8th Cir. 2006) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), and *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996)).

The elements of a claim of hostile environment sexual harassment differ somewhat, depending upon whether the alleged harasser is a co-worker or a supervisor. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). To prove such a claim based on harassment by a co-worker, the plaintiff must prove the following: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take proper remedial action. *See, e.g., Nitsche*, 446 F.3d at 845 (describing these as the elements of a *prima facie* case of hostile work environment sexual harassment by a co-worker); *Cheshewalla*, 415 F.3d at 850. When the harassment is by a supervisor, however, the plaintiff must prove the first four elements listed above, and if she also proves that the harassment resulted in a tangible employment action, then the employer is vicariously liable for the supervisor's harassment. *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (describing the first four elements as the "common" elements for supervisor and co-worker harassment claims); *Cheshewalla*, 415 F.3d at 850. If she does not prove that the supervisor's harassment resulted in a tangible employment action, then the employer may escape vicarious liability by proving the following elements of the *Ellerth/Faragher* affirmative defense: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise. *See Gordon*, 469 F.3d at 1195 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998)); *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 n.2 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 850-51.

### b.    Harassment by Warntjes and Herbst

For the reasons explained above, Parada's sexual harassment claim is now based exclusively on the conduct of two of her supervisors, Warntjes and Herbst. The court finds that the defendants' motion for summary judgment on this claim puts at issue only some of the common elements of a sexual harassment claim, whether that claim is based on sexual harassment by a co-worker or a supervisor. Specifically, the defendants have moved for summary judgment on Parada's sexual harassment claim based on the conduct of Warntjes and Herbst on the grounds that their conduct was not "unwelcome" nor sufficiently "severe." *See Gordon*, 469 F.3d at 1194-95 (second and fourth elements of a supervisor harassment claim); *Chewewalla*, 415 F.3d at 850 (same). The court will consider in turn the challenged elements of Parada's claim of sexual harassment by her supervisors.[7]

---

[7]The first element, that the plaintiff belongs to a protected class, is not in dispute here, because the plaintiff is female. *See id.*; *see also* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination "because of . . . sex"). Nor is the third element, whether the conduct was "because of" or "based on" sex, at issue here, *see Gordon*, 469 F.3d at 1194-95 (the third element of a claim of supervisor harassment is that the challenged conduct was because of or based on sex); *Cheshewalla*, 415 F.3d at 850 (same), even though only some of the challenged conduct by Warntjes and Herbst was explicitly sexual, and some was at best implicitly so. "Harassment alleged to be because of sex need not be explicitly sexual in nature." *Carter v. Chrysler Corp.*, 173 F.3d 693, 700-01 (8th Cir. 1999). On the other hand, even where the sexual content of conduct is abundant, that may not be enough to establish that the conduct was "because of sex," because "'the Supreme Court

(continued...)

31

*i.* ***"Unwelcome" harassment***. "Unwelcomeness" of the alleged sexual harassment is the second element of a sexual harassment claim, whether based on the conduct of a co-worker or a supervisor. *See Nitsche*, 446 F.3d at 845 (co-worker harassment); *Cheshewalla*, 415 F.3d at 850 (supervisor harassment). Indeed, the "unwelcomeness" of the alleged sexual harassment is "'[t]he gravamen of any sexual harassment claim.'" *Wilson v. City of Des Moines*, 442 F.3d 637, 643 (8th Cir. 2006) (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986)). "In determining whether conduct is "unwelcome," [courts] should consider whether the plaintiff indicated, by her conduct, that the alleged harassment was unwelcome." *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 728-29 (8th Cir. 2000). Whether the allegedly harassing conduct was "unwelcome" is generally a question of fact for the jury, however, because it "turns largely on credibility determinations." *Id.* at 729.

The defendants point out that Parada did not tell Warntjes or Herbst to stop their conduct or complain about their conduct to Bye, nor did she stop taking breaks in the service office. Parada's failure to do any of these things, they contend, undermines her

---

[7](…continued)
has never held that "workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations."'" *Nitsche*, 446 F.3d at 846 (quoting *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir. 1999), in turn quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)). Rather, the "based on sex" or "because of sex" element requires the plaintiff to prove that "she was the target of harassment because of her sex." *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005). Indeed, she need not show that women were the only targets of such harassment, just that women were the primary targets. *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001). Thus, while there might be some question in some cases about whether conduct that is both explicitly and only implicitly sexual can satisfy this element, the court simply does not read the defendants' contentions to put this element at issue in this case.

32

assertions of "unwelcomeness" of the conduct in question (and, they contend, also undermines any inference of the "severity" of that conduct, as well). The court agrees that there is no evidence that Parada ever complained to anyone about conduct by Warntjes or Herbst. The court finds, further, that the weakness of the record on the "unwelcomeness" element is emphasized by evidence that Parada certainly knew how to complain and to whom when she was upset by Holler's conduct; evidence that she also knew that Bye, who had responded to her complaints about Holler, could discipline Warntjes and Herbst; evidence that she acknowledges that she found Bye approachable; and evidence that she saw Bye almost daily. Thus, because the question on this element is "whether the plaintiff indicated, by her conduct, that the alleged harassment was unwelcome," *Hocevar*, 223 F.3d at 728-29, Parada's conduct does little to indicate that the alleged harassment was "unwelcome."

Moreover, there can be little refuge in the general principle that "unwelcomeness" is a question of fact for the jury, *see id.* at 729, or in the further contention that the court must accept as true Parada's contention that conduct by Warntjes and Herbst was unwelcome, if there is no *evidence* giving rise to a genuine issue of material fact that the conduct was "unwelcome." *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (on a Rule 56 motion for summary judgment, the court must view all *the facts* in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from *the facts*, as demonstrated by or genuinely in dispute on record evidence); *and compare Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (on a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the court must assume that all facts alleged by the complaining party are true, and must liberally construe those allegations).

Parada asserted at oral arguments that the Supreme Court's decisions in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775 (1998), stand for the proposition that she was not required to complain about harassment by supervisors to establish her claim. She also contended, in her brief, that the harassment by Warntjes and Herbst led to her termination, which she contends is a "tangible employment action" sufficient to impose liability on GPI for the supervisors' harassment under *Ellerth* and *Faragher*, without regard to whether or not she complained about that conduct. There may be some merit to Parada's contention that she was not required to complain about harassment by supervisors to establish the basis for employer liability, at least if the harassment resulted in a "tangible employment action." *See, e.g., Gordon*, 469 F.3d at 1194-95 (when harassment is by a supervisor, the plaintiff must prove the first four elements common to co-worker and supervisor harassment claims, and if she also proves that the harassment resulted in a "tangible employment action," then the employer is vicariously liable for the supervisor's harassment, citing *Ellerth* and *Faragher*; the employee is not required to prove that the employer knew of the alleged harassment and failed to take prompt remedial action, as required to establish employer liability for co-worker harassment). However, that standard for vicarious liability of the employer for supervisor harassment does not mean that a reasonable jury could not infer from Parada's failure to complain to anyone about alleged sexual harassment by her supervisors that the harassment was neither "unwelcome" nor "severe." The questions raised here, on the defendants' motion for summary judgment on Parada's sexual harassment claim, are precisely whether Parada's failure to complain to anyone about the alleged sexual

harassment by her supervisors shows, beyond dispute, that the conduct in question was not "unwelcome" or "severe" enough to be actionable.[8]

Parada does rely on more than the factual nature of the "unwelcomeness" element, the court's supposed duty to accept her allegations as true, and the lack of any requirement that she complain about the harassment to support her contention that the "unwelcomeness" element is a jury question in this case. She also points to evidence that Bye failed to do anything effective to stop objectionable conduct by Holler. Although the inferences are, perhaps, tenuous, the court finds that there are inferences that Parada's failure to complain to Bye about a hostile work environment allegedly created by Warntjes and Herbst was excused by Bye's failure to deal effectively with Holler's conduct, because that failure arguably created and condoned objectionable treatment towards Parada, which may have left Parada with a reasonable belief that complaints by a female employee about objectionable conduct by male employees at GPI were futile. *Cf. Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 356 & n.5 (8th Cir. 1997) (a plaintiff's failure to complain to supervisors about a hostile work environment was excused where the supervisors created

---

[8]The court notes that the defendants have not asserted the *Ellerth/Faragher* affirmative defense to employer liability for sexual harassment by supervisors as a basis for summary judgment. Therefore, the court will not address Parada's contention that harassment by Warntjes and Herbst led to or resulted in a "tangible employment action." Furthermore, the court will not address any contention about whether, in the absence of any "tangible employment action," Parada can generate genuine issues of material fact to defeat the defendants' *Ellerth/Faragher* affirmative defense, where the record could be read to show that Parada unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, *see Gordon*, 469 F.3d at 1195 (second prong of *Ellerth/Faragher* affirmative defense), because Parada never complained to anyone about harassment by her supervisors and apparently did not take any action to remove herself from the supervisor's break room, where most of the harassment by Warntjes and Herbst purportedly took place.

35

and condoned the objectionable atmosphere). The court is not without substantial sympathy for the defendants' argument on this element, but the court, nevertheless, declines to grant summary judgment on Parada's sexual harassment claim on the ground that Parada failed to show that the conduct in question was "unwelcome" where reasonable inferences in Parada's favor are possible. *See Woodbridge Corp.*, 263 F.3d at 814 (on summary judgment in discrimination cases, exceptional deference to the nonmoving party is warranted,"[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . .").

    *ii.*     *"Severe" harassment*. The court is less uneasy about declining to grant summary judgment on Parada's claim of harassment by her supervisors on the "severity" element. *See Gordon*, 469 F.3d at 1194-95 (the fourth element of a supervisor harassment claim is that the harassment was sufficiently severe or pervasive); *Chewewalla*, 415 F.3d at 850 (same). As to this element, the Eighth Circuit Court of Appeals has explained that "[h]arassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working environment.'" *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998) (quoting *Harris*, 510 U.S. at 21); *see also Nitsche*, 446 F.3d at 845 (quoting *Howard*). "A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gordon*, 469 F.3d at 1194 (quoting *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000), in turn quoting *Harris*, 510 U.S. at 21)).

    More specifically,

> [The plaintiff] must clear a high threshold to demonstrate
> actionable harm, for "complaints attacking the ordinary

tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" obtain no remedy. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (internal quotation omitted). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787, 118 S. Ct. 2275 (citation omitted). To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant. *LeGrand,* 394 F.3d at 1101 (citation omitted). Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan,* 348 F.3d 714, 720 (8th Cir. 2003) (quoting *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir. 1999)). Such standards are demanding, for "Title VII does not prohibit all verbal or physical harassment" and is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). In determining whether a work environment was sufficiently hostile or abusive, we examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance. *Harris,* 510 U.S. at 23, 114 S. Ct. 367.

*Nitsche*, 446 F.3d at 845-46; *accord Cottrill*, 443 F.3d at 636 (same factors to determine whether the environment was hostile); *Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir. 2004) (because there is no "bright line" between conduct that constitutes sexual harassment and conduct that is merely unpleasant, the court must view the "totality of the circumstances" to determine whether there is a hostile environment. ).

37

There is little doubt that the conduct that Parada attributes to Warntjes and Herbst—if it occurred—was "rude and unpleasant," not to mention "boorish, chauvinistic, and decidedly immature," but the defendants contend that it was nothing more, and as such, it is not enough, standing alone, to create a hostile work environment. *See Nitsche*, 446 F.3d at 846 ("rude and unpleasant" conduct is not enough); *Duncan v. General Motors Corp.*, 300 F.3d 928, 935 (8th Cir. 2003) ("boorish, chauvinistic, and immature" conduct is not enough). The court does not agree.

The incidents in question were not merely rare, isolated, or sporadic, but routine—according to Parada's testimony, such conduct occurred at least weekly during her eleven months of employment with GPI. *See Nitsche*, 446 F.3d at 846 (considering whether the plaintiff alleges only a few, isolated, or sporadic incidents). Although this frequent conduct was not physically threatening, because it consisted of merely offensive utterances, it did, nevertheless, interfere with Parada's work environment. *See id.* (factors to determine sufficiency of the harassment include whether the conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely offensive utterances; and whether it unreasonably interfered with the employee's work performance). The inferences of interference with Parada's work performance arise largely from perpetration of the alleged harassment by Parada's immediate supervisors.

More specifically, as this court noted in *Steck v. Francis*, 365 F. Supp. 2d 951 (N.D. Iowa 2005), "[F]or both the 'objective' and 'subjective' prongs of the 'severity' inquiry, whether the harasser is a co-worker or a supervisor (or successively higher official or manager) is relevant to the determination of whether a hostile work environment is sufficiently severe or pervasive to be actionable." *Steck*, 365 F. Supp. 2d at 971. This is so, this court found, because where the harasser is a supervisor, "victims are and are reasonably perceived to be more vulnerable to supervisor harassment, because when the

38

harasser is a supervisor, the harasser may, and often does, find it easier to target and harass the victim." *Id.* at 972-73. What is particularly significant about this court's prior decision in *Steck* for present purposes is the suggestion therein that "the victim can more easily recognize and address conduct between co-workers as ordinary teasing, banter, or the rough and tumble of the workplace" than comparable conduct by a supervisor, and may feel more free to complain about conduct that crosses the line. *Id.* at 973. The record here suggests the truth of that observation, as Parada had little hesitation about confronting Holler's bad behavior and reporting it to Warntjes or Bye, but apparently was reluctant to address the objectionable conduct of Warntjes or Herbst, because they were not at the same level in the company hierarchy as she was. Thus, considering the "totality of the circumstances," *Nitsche*, 446 F.3d at 845-46 (whether a hostile environment has been created must be determined in light of the totality of the circumstances); *Baker*, 382 F.3d at 828 (same), including the fact that Warntjes and Herbst were Parada's supervisors, *Steck*, 365 F. Supp. 2d at 972-73, there is evidence from which a reasonable jury could infer that the environment to which Warntjes and Herbst subjected Parada was both objectively and subjectively hostile and abusive, even in the absence of complaints by Parada about that conduct at the time.

Therefore, the court declines to hold that conduct by Warntjes and Herbst does not, as a matter of law, constitute actionable harassment based on sex, in light of inferences that a reasonable juror could draw from the record. *Bunda*, 369 F. Supp. 2d at 1046 (to dispose of a motion for summary judgment, the court must determine whether there are genuine issues for trial); *see also Woodbridge Corp.*, 263 F.3d at 814 (on summary judgment in discrimination cases, exceptional deference to the nonmoving party is warranted,"[b]ecause discrimination cases often turn on inferences rather than on direct

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 39 of 69

evidence . . . .").[9]  Therefore, the defendants are not entitled to summary judgment on Parada's sexual harassment claim, as that claim has now been clarified or reformulated in oral arguments on the defendants' motion for summary judgment.

### D.  Sexual Discrimination

Parada has also asserted sexual discrimination claims in the sense of disparate treatment, as well as sexual harassment, in violation of Title VII and the ICRA.  The defendants have likewise moved for summary judgment on these claims.  Once again, the court's analysis of the defendants' motion for summary judgment on these claims begins with a summary of the arguments of the parties.  On this claim, the parties' written and oral arguments were, for the most part, consistent.

#### 1.     Arguments of the parties

##### a.     The defendants' initial argument

The defendants admit that they are uncertain what, precisely, is the basis for Parada's sexual discrimination claim.  They read the claim to allege that Parada's position as the service writer was eliminated because she was a woman.  The defendants contend that Parada cannot generate a *prima facie* case on such a claim, however, because Parada cannot demonstrate or generate genuine issues of material fact that she was performing her job satisfactorily to meet her employer's legitimate job expectations or that similarly

---

[9]The parties raised in the context of Parada's sexual harassment claim the sufficiency of the defendants' contention that Parada was the subject of numerous customer complaints to defeat the sexual harassment claim.  The court will not address in the context of Parada's sexual harassment claim whether customer complaints constituted a legitimate, non-discriminatory reason for the employer's conduct, because customer complaints cannot possibly serve as legitimate, non-discriminatory reasons for alleged sexual discrimination in the form of a sexually hostile work environment.

situated male employees were treated differently. As to both points, the defendants contend that Parada cannot show that any other employee had received multiple complaints from customers, to the point where customers were taking their business elsewhere. Thus, they contend that termination of the service writer position, which had been intended to improve customer satisfaction not to cause it to deteriorate, was a legitimate business decision that had nothing to do with Parada's gender. The lack of discriminatory intent, they argue, is apparent from their offer to Parada to continue working for GPI as a diesel technician, the position for which she had originally applied, at the same rate of pay she was receiving as the service writer.

### b.     *Parada's response*

For her part, Parada disputes that there were multiple complaints about her performance, because the truck repair business is always fraught with customer complaints. After all, she contends, the reason that customers bring in a truck is that they have a complaint about something that needs to be fixed. Moreover, she argues that it is not uncommon that a repair does not correct the exact thing that a customer expected to change. Parada also points out that she never worked on trucks, so that customers could not have been complaining very much about her work. Parada also argues that she was not just a service writer, because shortly after she started working for GPI, her position "morphed" into the day lead person with service writer responsibilities. Thus, she contends that, even if the service writer position was eliminated, the day lead person position was not, and after her termination, the day lead person position was filled by a male, Larry Herbst. Next, Parada contends that customers had also made complaints about male employees, including a complaint that Herbst had used a customer's truck without permission to tow another customer's truck, but he suffered no disciplinary action.

41

Parada also argues that the defendants' legitimate, non-discriminatory reason for their actions, supposed customer complaints about Parada, is an affirmative defense that the defendants must plead, but that they have not done so. Regardless of their failure to plead such a legitimate reason, Parada contends that whether or not there were complaints from customers is a contested fact, because no such complaints were brought to her attention during the time that she was employed at GPI. Moreover, in light of the failure of GPI to bring such complaints to her attention, she contends that the supposed customer complaints are "a ruse" to legitimize a discriminatory discharge, if it is appropriate to consider in litigation supposed customer complaints that were not a factor prior to her discharge.[10]

### c. The defendants' reply

In reply in further support of this part of their motion for summary judgment, the defendants argue that Parada has failed to identify any similarly situated male employee, that is, one with multiple complaints from customers, who was subjected to different treatment than she was. One complaint against Larry Herbst in all his years of employment with GPI, they assert, falls far short of making him similarly situated to Parada, who was the subject of multiple customer complaints within a few months. The defendants assert that, on the present record, no reasonable juror could conclude that the

---

[10]Although Parada's counsel asserted at oral arguments that Holler's conduct was "sex discrimination," not "sexual harassment," he explained that Parada's theory was not that Holler's discriminatory conduct was, itself, actionable, but that her complaints about bad behavior of a male employee by a female employee that resulted in termination of the female employee were the basis for her retaliation claim. Thus, Parada has not shifted the focus of her sexual discrimination claim away from the elimination or termination of her position, although she focuses on termination of both her service writer and lead person duties.

customer complaints about Parada did not occur or that Herbst and Parada were similarly situated. The defendants also contend that Parada's assertion that a legitimate, non-discriminatory reason for the employer's actions is an affirmative defense is contrary to applicable law. Instead, they contend that they need only produce such a reason and that they have done so. Moreover, they contend that Parada has produced nothing to rebut the legitimate, non-discriminatory reason that they offer for eliminating the service writer position. Specifically, they contend that Parada's assertion that nobody spoke to her about customer complaints simply does not rebut the existence of such complaints, as described, for example, by Bye in his deposition, or the sufficiency of those complaints as a justification to eliminate the service writer position.

### 2. *Analysis*

#### a. *Prohibitions and analytical process*

Title VII prevents an employer from making employment decisions that are based on an employee's sex or gender. *In re Union Pac. R.R. Employment Practices Litig.*, ___ F.3d ___, ___, 2007 WL 763842, *6 (8th Cir. March 15, 2007); *Kratzer v. Rockwell*, 398 F.3d 1040, 1046 (8th Cir. 2005); *see also* 42 U.S.C. § 2000e-2(a)(1) (Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex"). Although Title VII requires an employer to give similar treatment to similarly situated employees of both genders, it does not require an employer to give employees in a protected class more favorable treatment than other employees. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). Thus, the essence of a "disparate treatment" claim under Title VII is that the plaintiff must show that "'other employees outside of the protected group were allegedly treated more favorably and were similarly situated in all relevant respects.'" *Id.* (quoting *Gilooly v. Missouri Dep't of Health and Senior Servs.*,

43

421 F.3d 734, 739 (8th Cir. 2005)). When an employer's action is not based on a sex classification, however, it is not a sex-based violation of Title VII. *See Union Pac.*, ___ F.3d at ___, 2007 WL 763842 at *6; *Piantanida v. Wyman Ctr., Inc.*, 116 F.3d 340, 342 (8th Cir. 1997).

In the absence of direct evidence of sexual discrimination—and no party contends that there is any direct evidence here—the plaintiff's claim is analyzed under the familiar *McDonnell Douglas* burden-shifting analysis. *See, e.g., Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The first step in that analysis requires the plaintiff to establish a *prima facie* case of sexual discrimination; the second step requires the employer to produce a legitimate, non-discriminatory reason for its conduct; and the final step requires the plaintiff to produce sufficient evidence to rebut the employer's legitimate, non-discriminatory reason, which the plaintiff may do by showing that the employer's proffered reason is not only not the real reason, but is a pretext for sexual discrimination. *Id.* at 700-01. The court will consider the viability of Parada's sexual discrimination claim through each step in this analysis.

### b. *Parada's* **prima facie** *case*

To establish a *prima facie* case of disparate treatment based on sex, a plaintiff must show the following: (1) she was a member of a protected group; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males. *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 910 (8th Cir. 2006); *Turner v. Gonzalez*, 421 F.3d 688, 694 (8th Cir. 2005); *accord Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (a *prima facie* case of sex or race discrimination requires proof of the following: (1) the plaintiff was a member of a protected class; (2) she was meeting the employer's legitimate job expectations;

44

(3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 913 (8th Cir. 2006); *Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir. 2006).  The final element of a *prima facie* case of disparate treatment can also be met "if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination.'"  *Turner*, 421 F.3d at 694 (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003)).  The disputed elements here, the second ("qualification/meeting legitimate expectations") and the fourth ("similarly situated male/inference of discrimination"), require closer examination.

      *i.*    *The "qualification/meeting legitimate expectations" element*.  The Eighth Circuit Court of Appeals recently explained the "qualification/meeting legitimate expectations" element of the plaintiff's *prima facie* case of sex discrimination as follows:

> At the prima facie stage of a sex discrimination case, the employee must demonstrate objective qualifications.  *Legrand v. Trustees of University of Arkansas at Pine Bluff*, 821 F.2d 478, 481 (8th Cir. 1987).  An employee must show that her qualifications are equivalent to the minimum objective criteria.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003).  The threshold criteria are the plaintiff's physical ability, education, experience in the relevant industry, and the required general skills.  *Whitley v. Peer Review Systems, Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000) (physical ability); *Wexler*, 317 F.3d at 576 (education, experience, and general skills).  These qualifications are demonstrated when the employee "actually performs her job at a level that [meets her] employer's legitimate expectations."  *Whitley*, 221 F.3d at 1055; *see also Miller v. Citizens Sec. Group*, 116 F.3d 343, 346 (8th Cir. 1997).

*Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046-47 (8th Cir. 2005).

45

The parties have not put at issue Parada's qualification in terms of education or training.  *See id.*  Rather, the defendants contend that Parada cannot generate a genuine issue of material fact on this element of her *prima facie* case, as to elimination of her service writer position and, presumably, as to termination of her lead person duties, because the frequent complaints from customers about her performance demonstrate that she was not actually performing her job at a level that met her employer's legitimate expectations.  *See id.* (stating a "legitimate expectation" standard for "qualification"). Those complaints, the defendants contend, included a flat out refusal of one customer to speak with Parada and threats by other customers to take their business elsewhere rather than work with her.  The court agrees that Parada has failed to generate any genuine issues of material fact that there were, in fact, no such customer complaints.  Moreover, the court concludes that employers can legitimately expect an employee's performance not to engender customer complaints.  This is particularly true when the whole purpose of the employee's position, such as the service writer position at GPI, was to improve customer satisfaction.  Here, the record shows beyond dispute that Parada was not meeting that legitimate expectation, where there is evidence of serious customer complaints against her and no evidence, whatsoever, that the complaints did not occur.  Therefore, Parada has failed to generate genuine issues of material fact on the "qualification/meeting legitimate expectations" element of her *prima facie* case of disparate treatment sexual discrimination.

Nevertheless, the court will consider Parada's ability to generate genuine issues of material fact on other elements of her *prima facie* case and, indeed, at other steps in the burden-shifting analysis.

       *ii.*     *The "similarly situated male/inference of discrimination" element*.  The defendants also challenge Parada's ability to generate genuine issues of material fact on the "similarly situated male" element of her *prima facie* case of sexual discrimination.

46

*See Tenge*, 446 F.3d at 910 (identifying the elements of the *prima facie* case); *Turner*, 421 F.3d at 694 (same). Where Parada claims that she was subject to disparate discipline, the elimination of her service writer position and termination of her lead person duties, because of customer complaints, she must show that she and male co-workers "were 'involved in or accused of the same or similar conduct and [were] disciplined in different ways.'" *Id.* (quoting *Rodgers v. U.S. Bank, NA*, 417 F.3d 845, 852 (8th Cir. 2005)); *Turner*, 421 F.3d at 695. Here, however, Parada has not identified *any* male employee of GPI who had comparable problems with or frequency of customer complaints, but who was treated differently. At best, she has identified an isolated instance in which Herbst received a customer complaint, but did not lose any of his responsibilities. *See Turner*, 421 F.3d at 695 (isolated incidents of mistakes by male co-workers were not similar to the plaintiff's pattern of ignoring internal workplace responsibilities and deadlines that led to a negative performance review, so that the male co-workers were not similarly situated to the plaintiff). This evidence is simply not sufficient to generate a genuine issue of material fact that Herbst was "similarly situated."

The fourth element can also be met "if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination.'" *Turner*, 421 F.3d at 694 (quoting *Putman*, 348 F.3d at 736). The court finds that Parada also is unable to generate a genuine issue of material fact on this variant of the fourth element of her *prima facie* case. The court does not find that there is any such inference here, for the simple reason that GPI did not fire Parada, but instead offered her an alternative assignment—and, indeed, the position for which she originally applied—at the same wage, and Parada chose not to accept that alternative assignment. This is not a case in which the alternative assignment was so unattractive or onerous or involved such different pay, benefits, and duties that an inference of discrimination reasonably arises. *Cf., e.g., Higgins v.*

47

*Gonzales*, ___ F.3d ___, ___, 2007 WL 817505, *4 (8th Cir. March 20, 2007) ("This court has held, however, a job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient to establish an adverse employment action.") (citing *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994), as holding that a job reassignment involving "nothing more disruptive than a mere inconvenience or an alteration of job responsibilities," without any "diminution in … title, salary, or benefits" is insufficient to establish an adverse employment action). Here, evidence that Parada was offered the position for which she had originally applied, at the elevated wage she had been enjoying, completely undermines any inference that the elimination of Parada's service writer position and termination of her lead person duties were sex-based rather than performance-based.

In short, the court finds that Parada has failed to generate genuine issues of material fact on the challenged elements of her *prima facie* case of sexual discrimination in the elimination of her service writer position and termination of her lead person duties, and the defendants are, consequently, entitled to summary judgment on that claim. *Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law"). The court will, nevertheless, consider the remaining steps in the burden-shifting analysis, not least because they also would require summary judgment in the defendants' favor. *See, e.g., Twymon*, 462 F.3d at 935 (the court may assume, without deciding, that the plaintiff has established a *prima facie* case of discrimination, and move on to consider the later stages of the analysis).

48

### c.    *The defendants' legitimate reasons*

The second stage of the burden-shifting analysis—assuming that the plaintiff has generated a *prima facie* case of discrimination—considers whether the defendants have a legitimate, non-discriminatory reason for the allegedly discriminatory conduct. *See, e.g., Wells*, 469 F.3d at 700-01. The defendants rely on customer complaints about Parada for their legitimate, non-discriminatory reason, and they point to Bye's deposition testimony to substantiate the existence and seriousness of those customer complaints, including Bye's belief that GPI had actually lost business because of customer dissatisfaction with Parada. Parada acknowledges that the defendants assert as a legitimate, non-discriminatory reason for elimination of her service writer position repeated customer complaints about her performance in that position, but disputes that this reason justifies either elimination of her service writer position or termination of her lead person duties. Parada also argues that the defendants failed to plead this legitimate, non-discriminatory reason as an "affirmative defense."

As the defendants assert, Parada's contention that the employer's legitimate, non-discriminatory reason for its actions is an affirmative defense that must be pleaded and proved by the employer is simply wrong. An employer is only required *to articulate* or *to produce* a legitimate, non-discriminatory reason for its actions. *See, e.g., Tenge*, 446 F.3d at 910 (the employer must "articulate" the reason); *Fair v. Norris*, ___ F.3d ___, ___, 2007 WL 896276, *4 (8th Cir. March 27, 2007) (the employer bears the "burden of production" to "articulate" a legitimate, non-discriminatory reason). The burden on the employer is not one of proof or even persuasion, and instead, can be met with "[a] minimal evidentiary showing." *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005); *see generally Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion; it can involve no credibility

49

assessment.") (quotation omitted). This court can find no authority for the proposition that the defendants' legitimate, non-discriminatory reason for its actions constitutes an affirmative defense that must be pleaded and proved, nor any support for Parada's further contention that such a reason is "waived" if it was not brought to the plaintiff's attention before taking adverse action against her, and Parada has cited no case actually supporting either her "affirmative defense" or "waiver" argument.[11]

---

[11]At oral arguments, Parada asserted that this court's decision in *Griffiths v. Winnebago Industries, Inc.*, 369 F. Supp. 2d 1063 (N.D. Iowa 2005), stands at least indirectly for the proposition that the employer's legitimate, non-discriminatory reason is the sort of matter that must be pleaded. However, in *Griffiths*, this court noted that the analytical framework for an Equal Pay Act (EPA) claim differs from the *McDonnell Douglas* burden-shifting analysis for other discrimination claims in that, "'[u]nder the EPA, a defendant cannot escape liability by articulating a legitimate, non-discriminatory reason for the employment action. Rather, the defendant must prove that the pay differential was based on a factor other than sex.'" *Griffiths*, 369 F. Supp. 2d at 1168 (quoting *Taylor v. White*, 321 F.3d 720, 716 (8th Cir. 2003), with citation and footnote omitted). Of course, Parada's sexual discrimination claim based on elimination of her service writer position and termination of her lead person duties is a Title VII claim subject to the *McDonnell Douglas* burden-shifting analysis, not an EPA discrimination claim, so that *Griffiths* actually supports treatment of the employer's legitimate, non-discriminatory reason as subject only to a burden of *production*, not to a burden of *pleading or proof*.

In her brief, in support of her "waiver" argument, Parada cites *Salz v. Stellar Industries, Inc.*, 2004 WL 439231 (N.D. Iowa March 10, 1994) (unpublished op.), which she asserts stands for the proposition that a defendant cannot rebut the presumption of discrimination created by the plaintiff's *prima facie* case by presenting evidence of poor performance, when that poor performance had not been a factor prior to the discharge. In *Salz*, Magistrate Judge Paul A. Zoss, now Chief Magistrate Judge of this district, denied summary judgment on a plaintiff's gender discrimination claim, even though the defendant asserted the plaintiff's failure to perform her duties properly as a legitimate, non-discriminatory reason for its actions, not because the defendant had not brought those performance problems to the plaintiff's attention before discharging her, but because the plaintiff had presented sufficient evidence to support submission of her claim to a jury,

(continued…)

50

More to the point, customer complaints *are* legitimate, non-discriminatory reasons for an employer's adverse actions towards an employee. *See Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir. 1992) (receiving continued complaints about an employee from customers "is a legitimate, non-discriminatory reason for discharging an employee"); *Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 531 (E.D.N.Y. 2005) (same); *Pascal v. Storage Tech. Corp.*, 152 F. Supp. 2d 191, 211 (D. Conn. 2001) (the employer's assertion that the plaintiff was reassigned because of customer complaints and poor performance satisfied the employer's burden of producing a legitimate, non-discriminatory reason for its actions). Thus, unless Parada can rebut this reason, at the final stage of the burden-shifting analysis, the defendants will be entitled to summary judgment.

### d. Pretext and discriminatory animus

If the employer states a legitimate, non-discriminatory reason for its actions, the court must consider whether the plaintiff has both discredited the employer's asserted reasons for adverse action and shown that the circumstances permit drawing the reasonable inference that the real reason for that adverse action was the plaintiff's protected characteristic. *See Twymon*, 462 F.3d at 935; *Riser*, 458 F.3d at 820. Parada attempts to meet this burden by asserting that few, if any, of the supposed customer complaints were brought to her attention before her service writer position was eliminated and her lead person duties were terminated. The defendants counter that Parada's assertion that nobody spoke to her about customer complaints simply does not rebut the existence of such

_____

[11](...continued)

consisting of evidence that the employer had never suspended or discharged a male employee for performance deficiencies, that male employees committed the same mistakes without being disciplined, and that the employer refused to provide her with information that she needed to perform properly the task that directly led to her discharge. *Salz*, 2004 WL 439231 at *6. Thus, *Salz* does not support Parada's "waiver" argument.

51

complaints, as described, for example, by Bye in his deposition, or the legitimacy of a decision to act on those complaints to eliminate the service writer position and to terminate Parada's lead person duties.

The court agrees with the defendants. It might have been better business practice, or simply more generous, for the defendants to inform Parada of the complaints and to give her the opportunity to attempt to improve her performance before eliminating her service writer duties and terminating her lead person duties, but the court is not to sit in judgment of an employer's business practices, so long as those practices are not discriminatory. *See, e.g., Arraleh v. County of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) ("'[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'") (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). Moreover, the record shows that the defendants permitted Parada to stay in the position of service writer (or service writer/lead person) for several months despite her evident conflicts with other personnel, such as Holler, and despite complaints from customers, so that the defendants did give Parada a reasonable chance to perform up to expectations. Nor was it so unreasonable to assume that Parada should be removed from her lead person duties, as well as her service writer position, based on customer complaints, because the defendants could reasonably have believed that Parada was not performing either set of duties adequately. *See, e.g., McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 512 (8th Cir. 1995) (the plaintiff's assertion that the decision to transfer her was unwise failed to generate an issue of fact on gender discrimination, because "'[a]n employer has the right to … assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge-for good reason, bad reason, or no

52

reason at all, absent intentional ... discrimination.'") (quoting *Walker v. AT & T Phone Ctr., Inc.*, 995 F.2d 846, 849-50 (8th Cir. 1993)). Thus, the fact that both Parada's service writer duties and lead person duties were taken away from her does not, on the present record, generate any inference of sexual discrimination. Finally, the defendants did not simply fire Parada, but instead offered her an alternative assignment at her current wage when they eliminated the service writer position and terminated Parada's lead person duties. As noted above, in the context of whether Parada could generate an inference of sexual discrimination, such evidence completely undermines any inference that the elimination of Parada's service writer position was sex-based. *Cf., e.g., Higgins*, ___ F.3d at ___, 2007 WL 817505 at *4 ("This court has held, however, a job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient to establish an adverse employment action.") (citing *Harlston*, 37 F.3d at 382, as holding that a job reassignment involving "nothing more disruptive than a mere inconvenience or an alteration of job responsibilities," without any "diminution in ... title, salary, or benefits" is insufficient to establish an adverse employment action). Viewing the evidence in its totality, no reasonable juror could conclude that the elimination of Parada's service writer position and the termination of her lead person duties was sex-based, thus defeating her sex discrimination claim. *See Union Pac.*, ___ F.3d at ___, 2007 WL 763842 at *6 (when an employer's action is not based on a sex classification, it is not a sex-based violation of Title VII); *Piantanida*, 116 F.3d at 342.

The defendants are entitled to summary judgment on Parada's sexual discrimination claim, because Parada cannot generate genuine issues of material fact on the essential elements of such a claim. *Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has

53

the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

### E. Retaliation

Parada contends that she was retaliated against for her complaints about Holler. The defendants also seek summary judgment on this claim. As always, the court's analysis of this part of the defendants' motion for summary judgment begins with a summary of the parties' arguments.

#### 1. Arguments of the parties

##### a. The defendants' initial argument

In support of their contention that they are entitled to summary judgment on Parada's retaliation claim, the defendants contend, first, that Parada has not exhausted administrative remedies on the state-law version of this claim, because she did not timely amend her administrative complaint to assert such a claim under Iowa law. Turning to the merits, the defendants contend that Parada cannot generate genuine issues of material fact on the "protected activity" or "causal connection" elements of her *prima facie* case. More specifically, they contend that Parada's retaliation claim fails, because none of the conduct upon which she bases her sexual harassment claim actually constitutes sexual harassment, so that she did not engage in any protected activity by complaining about such conduct. Next, they point out that Parada complained about Holler's conduct, but did not identify it as sexual in nature or as sexual harassment, and never complained at all about the conduct by Warntjes or Herbst that she now asserts was sexually harassing, so that there is no causal connection between any complaints about sexual harassment and her discharge. Moreover, they contend that Parada was not even able to articulate what conduct she alleges was in retaliation for complaints about Holler's or anyone else's

54

conduct. Even assuming that Parada did engage in protected activity, and assuming that the basis for her retaliation claim is the elimination of her service writer position and termination of her lead person duties, the defendants argue that they have asserted legitimate, non-discriminatory reasons—customer complaints—for elimination of the service writer position and termination of Parada's lead person duties, breaking the causal chain between allegedly protected activity and allegedly retaliatory conduct. They also contend that Parada has failed to rebut the proffered legitimate reasons for elimination of or changes in her duties.

### b. Parada's response

In response, Parada argues that she did complain about Holler's conduct and that such conduct did constitute or could reasonably have been believed to constitute sexual harassment. Moreover, she contends that Holler began what she describes as "his insidious attack" on her during the time that she was working as the lead person on his shift, because he wanted her position. She contends that Holler's "antics" continued for months, to the point where it was clear that something had to be done. She contends that the something that was eventually done was retaliatory elimination of her position. She contends that the pretextual nature of the elimination of the service writer position is shown by evidence that the lead person duties that she was also performing were not eliminated—instead, Larry Herbst took them over. She also contends that the defendants do not even proffer a reason for discharging her from her lead person duties. In response to the defendants' timeliness arguments, Parada contends that she properly amended her administrative complaint to assert a retaliation claim and that such an amendment related back to the original filing of her administrative complaint.

55

### c. The defendants' reply

The defendants' reply is concise: They contend that Parada has not come forward with any evidence that would cast even an inferential doubt on their reasons for eliminating her service writer position.

### d. Parada's oral argument

As explained above, in reference to Parada's sexual harassment claim, Parada clarified the import of Holler's conduct for purposes of this litigation by explaining that "[t]he claim with Shawn Holler . . . is a retaliation claim. . . . It's what happened with respect to Shawn Holler. When Ms. Parada began to make her complaints about what Shawn Holler was doing to her—and she believes and perceives that that was all based on the fact that he was a man, she was a woman, and he refused to work for her—she began to make those complaints to her supervisors, and the result is she was discharged for it. So that aspect of the case is a retaliation complaint. . . ." Realtime Transcript of Oral Arguments on April 6, 2007. Thus, contrary to all prior characterizations, it appears that Parada's retaliation claim is now based exclusively on the contention that Parada was retaliated against for complaining about *discrimination* by Holler, not for complaining about *harassment* by Holler.

### 2. Analysis

In addition to its prohibitions on creation of a sexually hostile work environment and sexually discriminatory treatment, Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). On the other hand, "'[f]iling a complaint [of discrimination] does not clothe [the plaintiff] with immunity for past and present

56

inadequacies.'"  *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (quoting *Calder v. TCI Cablevision of Mo.,* 298 F.3d 723, 731 (8th Cir. 2002), with internal quotations in *Calder* omitted).  A retaliation claim is subject to the familiar *McDonnell Douglas* burden-shifting analysis.  *See Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 569 (8th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)).  The court will consider Parada's retaliation claim through each step in the burden-shifting analysis.

> ### *a.*    *Parada's* **prima facie** *case*

To establish a *prima facie* case of retaliation, Parada must demonstrate the following:  (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action.  *Wells*, 469 F.3d at 702; *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 851.  The court will consider in more detail the challenged elements of Parada's *prima facie* case, the first and third ones.

> ### *i.*    *Protected activity*.  To constitute protected activity, as the basis for the first

element of a retaliation claim, the plaintiff's complaint must have been about conduct that a reasonable person could have found violated Title VII, that is, conduct that could reasonably be found to be sexual discrimination or could reasonably be found to be sexual harassment, *i.e.*, so severe or pervasive as to alter a term or condition of employment.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (*per curiam*); *Curd v. Hank's Discount Fine Furniture, Inc.*, 272 F.3d 1039, 1041 (8th Cir. 2001).  There is no doubt that Parada complained frequently and vociferously about Holler's conduct, but there is also no evidence that she ever complained that his conduct constituted sexual harassment (the basis for her retaliation claim in her brief) *or* sexual discrimination (the basis for her

retaliation claim in her oral arguments). Nevertheless, a reasonable juror could, perhaps, infer that Parada was complaining about what she reasonably believed to be sexual discrimination by Holler, that is, a man refusing to do what a woman told him to do and criticizing a woman's job performance because she was a woman, where there is little evidence of a comparable conflict between Holler and male employees in equal or nominally superior positions. Therefore, the court will assume that Parada has generated genuine issues of material fact on the "protected activity" element of her *prima facie* case of retaliation.

       ***ii.***    ***Causal connection***. The Eighth Circuit Court of Appeals very recently explained the requirements to prove the "causal connection" element, the third element of a *prima facie* case of retaliation, as follows:

> To prove a causal connection, [the plaintiff] must demonstrate the defendants' "retaliatory motive played a part in the adverse employment action." *Kipp v. Mo. Highway & Transp. Comm'n,* 280 F.3d 893, 896-97 (8th Cir. 2002) (quotation omitted). Evidence giving rise to an inference of retaliatory motive on the part of the employer is sufficient to establish the requisite causal link. *Id.* at 897. "An inference of a causal connection between [protected conduct] and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1119 (8th Cir. 2006) (citation omitted).

*Thomas v. Corwin*, ___ F.3d ___, ___, 2007 WL 967315, *10 (8th Cir. April 3, 2007); *see also Wells*, 469 F.3d at 702 ("'A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive.'") (quoting *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005)). A lack of causal connection can also be "reinforced" by undisputed evidence of customer or co-worker

58

complaints against the plaintiff. *Wells*, 469 F.3d at 702. Similarly, other intervening events between protected activity and adverse action may "erode" any causal connection suggested by temporal proximity between protected activity and adverse action. *Cheshewalla*, 415 F.3d at 852.

It is on this "causal connection" element that Parada's *prima facie* case of retaliation collapses. Whatever inference of causal connection might arise from proximity between Parada's complaints about Holler's conduct and the elimination of her service writer position and termination of her lead person duties is considerably dissipated by the fact that the defendants took no adverse employment action against Parada for *months* while she was complaining about Holler. *Cf. Thomas*, ___ F.3d at ___, 2007 WL 967315 at *10 (a gap between protected activity and adverse employment action weakens an inference of retaliatory motive). More importantly, however, is the undisputed (or not genuinely disputed) fact that there were customer complaints about Parada that fully justified the termination of her service writer position and lead person duties. *See Wells*, 469 F.3d at 702 (a lack of causal connection can be "reinforced" by undisputed evidence of customer complaints against the plaintiff). The intervening customer complaints, thus, "eroded" any causal connection suggested by temporal proximity, if any, between protected activity and adverse action. *Cheshewalla*, 415 F.3d at 852 (intervening events may "erode" the alleged causal connection).

Therefore, the court finds that the defendants are entitled to summary judgment on Parada's retaliation claim, because Parada cannot generate genuine issues of material fact on an essential element of her *prima facie* case. *Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

59

### b.     Legitimate reason and pretext

Even assuming, for the sake of argument, that Parada could establish a *prima facie* case of retaliation, however, her claim may still fail if the defendants produce, and Parada fails to rebut, a legitimate, non-discriminatory reason for the allegedly retaliatory action. *See Thomas*, ___ F.3d at ___, 2007 WL 967315 at *11 ("But even if [the plaintiff] established a prima facie case, the defendants offered legitimate reasons for terminating [the plaintiff], which [the plaintiff] fails to rebut with evidence of pretext.   Summary judgment in the defendants' favor is [therefore] proper on [the plaintiff's] retaliation claim.").  As was the case with Parada's sexual discrimination claim, the court finds that the defendants have offered a legitimate, non-retaliatory reason for eliminating Parada's service writer position and terminating her lead person duties, consisting of frequent customer complaints about Parada's performance in that position.  *See Anderson*, 965 F.2d at 401 (continued complaints about an employee from customers "is a legitimate, non-discriminatory reason for discharging an employee"); *Drummond*, 400 F. Supp. 2d at 531 (same); *Pascal*, 152 F. Supp. 2d at 211 (the employer's assertion that the plaintiff was reassigned because of customer complaints and poor performance satisfied the employer's burden of producing a legitimate, non-discriminatory reason for its actions).  Moreover, intervening events between protected activity and adverse action, such as customer complaints, may also defeat a plaintiff's retaliation claim, whether "cabined" as breaks in the causal chain or as the defendants' legitimate, non-discriminatory reasons for their action.  *See Cheshewalla*, 415 F.3d at 852 ("Whether we cabin our examination of these intervening events under the third element of the prima facie case or under the subsequent step of the defendant's legitimate, nondiscriminatory reason for its actions, the result is the same.") (internal citations omitted).  For the same reasons that the court found that Parada had not rebutted or raised a genuine issue of material fact undermining the defendants'

60

proffered legitimate, non-discriminatory reasons of customer complaints when raised in response to Parada's sexual discrimination claim, the court finds that Parada cannot generate genuine issues of material fact that rebut these reasons when raised in response to Parada's retaliation claim.

Therefore, the defendants are entitled to summary judgment on Parada's retaliation claim.

### F.  Unequal Pay

Parada's final claim is a claim of unequal pay on the basis of gender in violation of the Equal Pay Act, 29 U.S.C. § 206(d).  The defendants also seek summary judgment on this claim.  The court's analysis of this claim also begins with a summary of the parties' arguments.

#### 1.    Arguments of the parties

##### a.       The defendants' initial argument

In support of their contention that they are entitled to summary judgment on Parada's unequal pay claim, the defendants contend that Parada cannot generate genuine issues of material fact on either the "equal work" or "equal skill" elements of her claim. The defendants acknowledge that Parada has identified William J.R. Riecks, the night lead person, as the necessary comparator, but they contend that the service writer position, filled only by Parada, was not the same job as the night lead position, filled by Riecks, and that the positions involved different duties, not "equal work."  Moreover, even to the extent that Parada was the day lead person, the defendants contend that her duties were not the same as Riecks's, because she could not perform some of the duties, such as training, assisting, or supervising other diesel technicians and performing actual repairs, that were part of the regular duties of a lead person.  Indeed, they point out that Parada has admitted

61

that she has no idea what duties Riecks actually performed as night lead person. As to the "equal skill" element, the defendants point out that it is undisputed that Riecks had more than twenty years of experience as a diesel mechanic, teacher, and supervisor, while Parada was a recent graduate of a technical school with no work experience as a diesel mechanic. They also point out that Riecks had, and Parada lacked, a CDL, which limited her ability to test drive and shuttle trucks.

### b. *Parada's response*

Parada contends that it is undisputed that she was paid only $11.50 per hour, whether she was working as a day or night lead person, while Riecks was paid $16.00 per hour, which supposedly included a "night shift differential." Thus, she contends that the burden is on the defendants to demonstrate that the difference between her rate of pay and Riecks's was based on something other than sex. She also contends that she was a "service writer" only for a few weeks, but thereafter was a combined "service writer and lead person," and that she performed the same duties as Riecks, because she frequently covered the night lead person position before Riecks was hired and while he was off work as the result of a car accident. She acknowledges, as she must, that her level of experience was different from Riecks's, but she nevertheless contends that Riecks was physically incapable of performing most of the tasks that he had performed in the past owing to medical restrictions. Thus, she contends that Riecks was only a diesel mechanic "in spirit," but not in practice. She also contends that the jobs compared need not be identical, merely substantially equal in skill, effort, and responsibility, and that her position meets these requirements in comparison to Riecks's position.[12]

---

[12]Parada also challenges the sufficiency of some of the affirmative defenses that the defendants have pleaded to the unequal pay claim, but the defendants did not put those

(continued...)

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 62 of 69

### c. *The defendants' reply*

In reply, the defendants contend that Parada's affidavit, which seeks to add numerous duties to the list of her duties that she gave in her deposition, cannot generate an issue of fact on the similarity between her position and Riecks's position. Moreover, the defendants contend that Parada cannot legitimately assert that she had more experience or ability than her male comparator. Thus, even if Parada's list of duties could be considered, the defendants contend that it is clear that Parada did not teach or assist other diesel technicians as effectively as did Riecks, with his twenty-some years of experience as a diesel mechanic.

### 2. *Analysis*

### a. *Prohibitions and applicable standards*

In *Younts v. Fremont County, Iowa*, 370 F.3d 748 (8th Cir. 2004), the Eighth Circuit Court of Appeals summarized the analysis of a claim of unequal pay based on sex pursuant to the Equal Pay Act as follows:

> The EPA prohibits an employer from paying employees of one sex less than employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). The plaintiffs have the burden to prove their employer paid them less than male employees for substantially equal work. *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 491 (8th Cir. 2003). Whether employees perform substantially equal work "requires a practical judgment on the basis of all the facts and circumstances of a particular case, including factors such as

---

[12](...continued)

defenses at issue in their motion for summary judgment, so the court will not consider them here.

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 63 of 69

level of experience, training, education, ability, effort, and
responsibility." *Id.* at 492 (citation omitted). This analysis
does not depend "on job titles or classifications[,] but on the
actual requirements and performance of the job." *Id.* (citation
omitted). We are required to "compare the jobs in question in
light of the full factual situation and the [EPA's] broad
remedial purpose." *Id.* (citation omitted). When evaluating
the amount of effort required to perform a job, we consider
"the physical or mental exertion necessary to the performance
of a job," and when evaluating the amount of responsibility a
job entails, we consider "the degree of accountability required
in performing a job." *Berg v. Norand Corp.*, 169 F.3d 1140,
1146 (8th Cir. 1999) (citation omitted). We are not
particularly interested in a plaintiff's conclusory allegations
about which jobs are equal. *See id.* (Holding conclusory
affidavit testimony that two jobs are equal does not establish a
*prima facie* case under the EPA). Instead, we review the
actual requirements and performance of the jobs in question.

*Younts*, 370 F.3d at 752-53; *accord Grabovac v. Allstate Ins. Co.*, 426 F.3d 951, 956 (8th

Cir. 2005) ("'To establish a prima facie case under the [EPA], [the plaintiff must] show

that [the defendant] discriminated on the basis of sex by paying wages to employees of

opposite sexes "for equal work on jobs the performance of which requires equal skill,

effort, and responsibility, and which are performed under similar working conditions."'")

(quoting *Horn v. University of Minnesota*, 362 F.3d 1042, 1045 (8th Cir. 2004), in turn

quoting 29 U.S.C. 206(d)(1)); *Broadus v. O.K. Indus., Inc.*, 226 F.3d 937, 941 (8th Cir.

2000) ("To establish a violation of the Equal Pay Act, an employee must demonstrate that

the employer paid male and female employees different wages for substantially equal

work."); *Horner v. Mary Institute*, 613 F.2d 706, 713 (8th Cir. 1980) ("For purposes of

64

the Act, 'equal' means 'substantially equal'; male and female jobs may be compared even if they are not identical.").[13]

It is clear that the jobs of the plaintiff and the comparator "'need not be identical to be considered "equal" under the EPA; they need only be substantially equal.'" *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 578 (8th Cir. 2006) (quoting *Hunt v.*

---

[13] If a plaintiff establishes a *prima facie* case of unequal pay, "the burden shifts to the defendant to prove one of the affirmative defenses set forth under the EPA." *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003); *see Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 683 (8th Cir. 2001) ("Once the plaintiff has proven her *prima facie* case, the employer then bears the burden of coming forward with a legitimate nondiscriminatory factor upon which it based the wages paid.") (citing 29 U.S.C. § 206(d)(1) (1994) and *Hutchins v. Intn'l Brotherhood of Teamsters*, 177 F.3d 1076, 1080-81 (8th Cir. 1999))*; Inglis v. Buena Vista Univ.*, 235 F. Supp. 2d 1009, 1019 (N.D. Iowa 2002) ("Once the plaintiff has proven her *prima facie* case, the employer then bears the burden of coming forward with a legitimate nondiscriminatory factor upon which it based the wages paid."). The EPA provides the following affirmative defenses an employer can rely on as justifying a discrepancy in wages between male and female employees: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a difference based on any other factor other than sex . . . ." 29 U.S.C. § 206(d)(1). "This analytical framework differs from the *McDonnell Douglas* burden shifting analysis [in that] [u]nder the EPA, a defendant cannot escape liability by articulating a legitimate, non-discriminatory reason for the employment action. Rather, the defendant must prove that the pay differential was based on a factor other than sex." *Taylor*, 321 F.3d at 716 (citation and footnote omitted); *Fagan v. Iowa*, 301 F. Supp. 2d 997, 1002-03 (S.D. Iowa 2004) (holding that it is not appropriate to analyze the plaintiff's EPA claim under the *McDonnell Douglas* burden shifting analysis, and noting that the critical difference between "the [EPA] framework and the *McDonnell Douglas* burden-shifting paradigm is which party has the ultimate burden of proof on the issue of discrimination."). As explained above, however, the defendants here have put at issue in their motion for summary judgment only the sufficiency of Parada's *prima facie* case of unequal pay. Only Parada attempted to put at issue the sufficiency of any of the defendants' affirmative defenses. Thus, the court's analysis focuses entirely on the sufficiency of Parada's *prima facie* case of unequal pay.

65

*Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)); *Younts*, 370 F.3d at 752-53. More specifically,

> The inquiry as to whether two jobs are equal is a factual one:
>> Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job. In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute.
>
> *EEOC v. Universal Underwriters Ins. Co.,* 653 F.2d 1243, 1245 (8th Cir. 1981) (citing 29 C.F.R. §§ 800.114-.132). Thus, whether [the plaintiff] and [the comparator] had equal jobs is a factual inquiry, dependent on their job requirements, not their job titles, and anchored around skill, effort, and responsibility.

*Simpson*, 441 F.3d at 578. Although the inquiry is "factual," summary judgment may still be appropriate on the sufficiency of the plaintiff's *prima facie* case of unequal pay, where there is no genuine dispute that the plaintiff was not subjected to unequal pay for equal work. *See Grabovac*, 426 F.3d at 956 (summary judgment on the plaintiff's unequal pay claim was appropriate where the record showed that she had the second highest salary and bonus in the year in question when compared to four male marketing business consultants); *Younts*, 370 F.3d at 748 (affirming summary judgment for the employer on an EPA claim based on insufficiency of evidence comparing the plaintiff's job to a male comparator).

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 66 of 69

### b. *Parada's* **prima facie** *case*

Here, there is no dispute that Parada was paid less than her male comparator, Riecks, because she was paid $11.50 per hour, while Riecks was paid $16.00 per hour. *See Younts*, 370 F.3d at 752 (the plaintiff must prove that she was paid less than male employees). On the other hand, the court concludes that Parada has failed to generate any genuine issue of material fact that her job was "substantially equal" to Riecks's. *Simpson*, 441 F.3d at 578 (the plaintiff is only required to show that her job and the comparator's job were "substantially equal"). Even if the court assumes that Parada was a "lead person" as well as a "service writer," and that Riecks was also a "lead person," the fact that Parada and her male comparator had the same job title simply is not the end of the inquiry. *Simpson*, 441 F.3d at 578 ("[W]hether [the plaintiff] and [the comparator] had equal jobs is a factual inquiry, dependent on their job requirements, not their job titles, and anchored around skill, effort, and responsibility."); *Younts*, 370 F.3d at 753 ("This analysis does not depend on job titles or classifications[,] but on the actual requirements and performance of the job.") (internal quotation marks and citations omitted). Rather, there is no dispute that Riecks not only had vastly more experience as a diesel mechanic than Parada, and consequently, had vastly greater ability to perform repair work and to assist and supervise the work of other diesel mechanics, but that he also did so, while Parada's evidence suggests that she performed only limited repair work and could only provide limited assistance or supervision to other diesel mechanics. *See id.* (the proper comparison is skill, including experience, training, education, and ability, as well as effort and responsibility).

As the court explained above, Parada's contentions that Riecks could and did perform only limited work, such as changing light bulbs, and did not even have his own set of tools at GPI are not supported by and, in fact, are contradicted by the record. Even

Case 5:06-cv-04002-MWB   Document 32   Filed 04/11/07   Page 67 of 69

if Riecks was physically limited in the work that he could do himself, Riecks's superior experience gave him a vastly greater ability to assist, supervise, evaluate, and approve the work of other diesel mechanics than Parada possessed. Moreover, even assuming that Parada's and Riecks's positions required substantially equal "effort," *see id.* ("effort" is a relevant criterion for comparison), their "responsibilities" were not the same, *id.* ("responsibility" is another relevant criterion), because Parada attempts to compare responsibilities that she had occasionally, as the service writer/day lead person and sometime substitute night lead person, with responsibilities that Riecks had all the time as night lead person. Indeed, even though Parada sometimes covered for Riecks, that undisputed fact fails to generate a genuine issue of material fact that she performed the same responsibilities as Riecks where she admits that she did not even know what responsibilities he routinely performed. *See Younts*, 370 F.3d at 752-53 (the analysis depends on actual requirements and actual performance of the job).

Thus, Parada has failed to generate genuine issues of material fact on essential elements of her unequal pay claim; consequently, the defendants are entitled to summary judgment on that claim. *Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

### III. CONCLUSION

After applying an experienced eye to Parada's various claims, *see* OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881) ("The life of the law has not been logic; it has been experience."), and recognizing that the court must not weigh the evidence, but may only determine whether there are genuine issues for trial, *see Bunda*, 369 F. Supp. 2d at 1046

(the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial), the court concludes that Parada has generated genuine issues of material fact only on her sexual harassment claim based on the conduct of two supervisors, Warntjes and Herbst. Under these circumstances, only that sexual harassment claim will go to the jury.

THEREFORE, the defendants' January 11, 2007, Motions [sic] For Summary Judgment (docket no. 19), is **granted in part and denied in part**, as follows:

1.     The motion is **denied** as to Parada's claims of sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216 in her First and Second Causes of Action, respectively.

2.     The motion is **granted** as to Parada's claim of sexual discrimination in violation of Title VII and the ICRA in her First and Second Causes of Action, respectively.

3.     The motion is **granted** as to Parada's claim of retaliation for complaining about sexual harassment in violation of Title VII and the ICRA in her Third and Fourth Causes of Action, respectively.

4.     The motion is **granted** as to Parada's claim of unequal pay in violation of the Equal Pay Act, 29 U.S.C. § 206(d) in her Fifth Cause of Action.

**IT IS SO ORDERED.**

**DATED** this 11th day of April, 2007.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

69